**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
LAUREN GUMBINER,                              :
                                              :
                          Plaintiff,          :          05 Civ. 2569 (RMB)(FM)
                                              :
             -against-                        :          <u>**DECISION & ORDER**</u>
                                              :
WILLIAMS-SONOMA, INC. and                     :
WEST ELM, INC.,                               :
                                              :
                                              :
                          Defendants.         :
-------------------------------------------------------------x

## I.    Introduction

On or about January 27, 2005, Lauren Gumbiner ("Plaintiff") filed a complaint in New

York State Supreme Court, County of New York, against Williams-Sonoma, Inc. ("Williams-

Sonoma") and West Elm, Inc. ("West Elm," and collectively "Defendants"), alleging "unlawful

employment discrimination on the basis of religion/creed . . . pursuant to § 8-107(a) of the

Administrative Code of New York City."  (Verified Complaint, dated January 27, 2005

("Complaint") ¶ 1.)  Plaintiff, who is Jewish, alleges that she was terminated from her job as

general manager of a West Elm store on December 10, 2004 "because she observed the Yom

Kippur holiday." (Complaint ¶ 27-28.)  On or about March 2, 2005, the case was removed to the

United States District Court for the Southern District of New York on the basis of diversity of

citizenship under 28 U.S.C. § 1332.  (Notice of Removal to United States District Court from

New York State Supreme Court, County of New York, Index No. 101635/05, dated March 2,

2005.)

On or about December 29, 2005, Defendants moved for summary judgment pursuant to

Rule 56 of the Federal Rules of Civil Procedure.  (Defendants' Memorandum of Law in Support

of Motion for Summary Judgment, dated December 29, 2005 ("Def. Mem."); Defendants'

Statement of Undisputed Material Facts in Support of Motion for Summary Judgment Pursuant to L. Civ. R. 56.1, dated December 29, 2005 ("Def. Stmt.").)  On or about January 30, 2006, Plaintiff filed an opposition.  (Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment, dated January 30, 2006 ("Opposition"); Plaintiff's Counterstatement in Response to Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment Pursuant to Local Civil Rule 56.1 and Plaintiff's Statement of Material Facts in Dispute, dated January 30, 2006 ("Pl. Stmt."); Declaration of Lauren Gumbiner, in Opposition to Defendants' Motion for Summary Judgment, dated January 30, 2006 ("Gumbiner Decl.").) On or about February 24, 2006, Defendants filed a reply.  (Reply Memorandum of Law in Further Support of Motion for Summary Judgment, dated February 14, 2006 ("Reply").)

   **For the reasons set forth below, Defendants' motion for summary judgment is granted.**

## II.     Background

   Plaintiff "was employed by Williams-Sonoma Stores, Inc. commencing on June 3, 2004. She was hired to work as the general manager of the soon to be opened [W]est [E]lm store located in the Chelsea area of Manhattan . . . where she would recruit, hire and train the entire staff for the Chelsea location."  (Def. Stmt. ¶ 3; Pl. Stmt. ¶ 7, 9.)  Prior to the opening of the Chelsea store on October 4, 2004, Plaintiff was assigned to another West Elm location.  (Def. Stmt. ¶¶ 3, 5; Pl. Stmt. ¶ 8.)

   "[O]n or about September 22, 2004, [Plaintiff] telephoned her supervisor, Geoff Staff, to advise him that she would be taking off work [part of] the following Saturday and [all day] Sunday in order to observe the Yom Kippur holiday.  Plaintiff is an observant Jew. . . . Mr. Staff explained he needed her to work, questioned her about the need to be absent from work given

2

that it was a week before the store opening, and also asked if she could come to work on Sunday or work from home."  (Def. Stmt. ¶ 6; Pl. Stmt. ¶¶ 14 ("Mr. Staff asked Plaintiff on five separate occasions [during the call] for the dates of her observance of Yom Kippur. . . . He also stated that Plaintiff needed to clearly explain to him what Yom Kippur is, and stated that he did not understand why she could not be at work. . . . Mr. Staff asked if she could come in to work on Sunday (the day of Yom Kippur), or if she could work from home on that day.  He said to Plaintiff, 'You will be sitting home all day doing nothing, you can't work from home?'"), 49-54.)

Directly following her telephone conversation with Mr. Staff, Plaintiff "went to the office of Mr. Staff's boss, Michael Dadario, and expressed her concerns about Mr. Staff's comments in response to her request for time off to observe Yom Kippur.  In response, Mr. Dadario assured Plaintiff that she would get the day off to observe Yom Kippur and that he would follow up with Mr. Staff to ensure she would have the day off. . . . Mr. Dadario also told her 'Well, [Mr. Staff] is from California and there [are] not many Jews there, so he wouldn't know what this holiday was.'  **Plaintiff did in fact receive time off to observe Yom Kippur**."  (Def. Stmt. ¶ 7; Pl. Stmt. ¶¶ 16-20, 55-61) (emphasis added).

Plaintiff returned to work on Monday, September 27, 2004, and "discovered that [over the weekend] a mistake had been made regarding the delivery and storage of certain furniture." (Pl. Stmt. ¶ 21.)  Plaintiff asserts that "Mr. Staff, in discussing the mistake, told Plaintiff that 'maybe if you weren't off on Yom Kippur this wouldn't have happened,'" but Defendants dispute this statement.  (Pl. Stmt. ¶ 21; Def. Stmt. ¶ 19 ("Plaintiff was unable to identify any witnesses to an alleged inappropriate comment by Mr. Staff following her return to work after Yom Kippur and he categorically denied making the alleged statement.").)

"On September 29, 2004, Deborah Murtha started her employment as East Coast District Manager for [W]est [E]lm at which time she became Plaintiff's immediate supervisor."  (Def. Stmt. ¶ 8; Pl. Stmt. ¶ 72.)

The Chelsea store opened on October 4, 2004.  (Pl. Stmt. ¶ 22; Def. Stmt. ¶ 10.)  The parties dispute the success of the grand opening.  (Pl. Stmt. ¶ 23 ("The Chelsea store opening was wildly successful – it was the most successful store opening in the history of West Elm."); Def. Stmt. ¶ 10 ("Having observed the entire day's store operations, Ms. Murtha concluded that while sales volume had been highly successful for the store's opening, the store management and staff had not been sufficiently prepared, trained and ready for the opening.  This general lack of organization created a chaotic atmosphere in the store with staff and managers unable to focus on their responsibilities and resulting in below standard customer service.").)  On the day of the opening, Plaintiff was criticized by Mr. Staff for her performance.  (Pl. Stmt. ¶¶ 24-27 ("Mr. Staff told Plaintiff that she was not open-minded, was too young for her position, and was not a team player.  He further stated that she did not listen actively, did not go at the same tempo as the rest of the management team, and that she was not on the same tone as the rest of management.").)  Ms. Murtha also "shared her observations and concerns [about Plaintiff's performance] with her supervisor, Mr. Staff, as well as Senior Vice President Michael Dadario." (Def. Stmt. ¶ 11 ("Both individuals had attended the store opening and were of the same opinion regarding the lack of organization and training apparent in the conduct of the sales staff.").)

"On October 6, 2004, two days after the store opened . . . Plaintiff met with Ms. Murtha to discuss the latter's concerns about Plaintiff's work performance."  (Pl. Stmt. ¶ 28; Def. Stmt. ¶¶ 12-13.)  Ms. Murtha had additional discussions with Plaintiff about her work performance on October 11, 13, 15, and 19, 2004.  (Def. Stmt. ¶¶ 14-15; Pl. Stmt. ¶ 32.)  On October 25 or 26,

4

2004, "Ms. Murtha met with Plaintiff and presented her with a written Performance Documentation of a First Counseling. This initial first counseling identified performance not meeting expectations in the areas of Leadership, Communication and Organization. The Performance Documentation set out specific examples of the types of behaviors in need of improvement. In addition, Plaintiff [was] supplied a Performance Improvement Plan which listed a set of goals and objectives to be accomplished by Plaintiff over the next 30 days." (Def. Stmt. ¶ 16; Pl. Stmt. ¶ 33.)

"Upon receiving this First Counseling, Plaintiff contacted Jennifer Flegel, Director of Human Resources for Emerging Brands, and asked to meet to discuss her concerns over receiving the performance documentation. Ms. Flegel met with Plaintiff on November 2, 2004. Plaintiff expressed surprise at receiving the performance documentation and felt that she was being issued a First Counseling because she is Jewish and had earlier asked to take time off to observe Yom Kippur. Plaintiff then recounted for Ms. Flegel her discussion with Mr. Staff concerning her need to take time off and having to involve Mr. Dadario to ensure she would receive the time off. . . . Ms. Flegel advised Plaintiff that she would investigate her concerns and interview the other individuals involved." (Def. Stmt. ¶ 17; Pl. Stmt. ¶ 33 ("Plaintiff told Ms. Flegel that as soon as the Yom Kippur incident occurred 'everything went downhill,' and that she had received 'nothing but praise' before that.").)

"Following the meeting with Plaintiff on November 2, 2004, Ms. Flegel conducted an investigation of Plaintiff's concerns that she was being discriminated against due to her religion. Ms. Flegel interviewed Messrs. Staff and Dadario regarding their versions of the discussions with Plaintiff concerning her request for time off to observe Yom Kippur. Mr. Staff denied any inappropriate comments and explained that he had questioned Plaintiff about the amount of time

she would be taking since he was not familiar with this observance and what it entailed. . . . Mr. Dadario likewise explained that when Plaintiff raised her concerns to him, he assured her that she would be allowed time off to observe her religious holiday.  According to Ms. Murtha, she had not been instructed or directed by Mr. Staff to issue the performance documentation to Plaintiff nor was he involved in the preparation of the documentation.  Ms. Murtha informed Ms. Flegel that she made the decision to issue the performance documentation to Plaintiff as her supervisor and was not ordered to do so by anyone. . . . Based on these interviews and the information received from Plaintiff, Ms. Flegel was unable to substantiate any discrimination claim made by Plaintiff and [she determined that] the performance issues concerning Plaintiff were unrelated to Plaintiff's religion or the fact that she took time off to observe Yom Kippur."  (Def. Stmt. ¶¶ 19-20.)

"Plaintiff received a second counseling on November 11, 2004 [and] a third counseling on November 17, 2004."  (Pl. Stmt. ¶¶ 34, 75, 76.)  Defendants state that these job evaluations were presented by Ms. Murtha "based on her continued observations of Plaintiff's job performance, that she was not meeting the expectations set forth in the First Counseling," specifically with regard to Plaintiff's "communications with her staff . . . leadership . . . tardiness and lack of preparation in conducting team meetings," among other things.  (Def. Stmt. ¶¶ 21-24.)  Also, although Plaintiff disputes any personal responsibility for the issues identified, she was "specifically counseled by Ms. Murtha with respect to mistakes later discovered in the calculation of [payments in an incentive program for sales associates].  As a result of those mistakes, several thousands of dollars in overpayments to sales associates for incentive payments were made for the weeks of October 27, 2004 and November 7, 2004."  (Def. Stmt. ¶ 22; Gumbiner Decl. ¶¶ 2-4.)

"Following issuance of the November 17, 2004 Final Counseling Performance Documentation, in early December 2004, Ms. Murtha advised Mr. Dadario and Ms. Flegel that Plaintiff had failed to accomplish the required goals and objectives placed on her and recommended that Plaintiff be terminated from her position as a general manager of the Chelsea [W]est [E]lm store. . . . Ms. Murtha's recommendation was accepted by Mr. Dadario and Ms. Flegel."  (Def. Stmt. ¶ 25.)  "On December 10, 2004, Ms. Murtha and Mr. Dadario met with Plaintiff to notify her of the decision to terminate her employment."  (Def. Stmt. ¶ 26.)

## III.    Legal Standard

"Summary judgment is appropriate only where the parties' submissions show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999).  "Of course, in ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. . . . [T]he trial court must be especially cautious in deciding whether to grant this drastic provisional remedy in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination."  Id.  However, "summary judgment may be appropriate even in the fact-intensive context of employment discrimination cases."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001).

Further, "even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment."  Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997).  "[T]he test for summary judgment is

[ultimately] whether the evidence can reasonably support a verdict in plaintiff's favor."[1]  James v. New York Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000).

## III.    Analysis

### A.    Alleged Discrimination

Defendants argue that "Plaintiff cannot establish a prima facie case of discriminatory discharge" because "based on Plaintiff's short term of employment, there can be no inference of discrimination," and because "Mr. Staff had no role whatsoever in the decision to discharge her." (Def. Mem. at 17, 19.)  Defendants also argue that they have "articulated a legitimate, non-discriminatory reason for [Plaintiff's] termination . . . based on her continued deficiencies for several months."  (Def. Mem. at 19-20.)  Plaintiff argues that "the termination occurred under circumstances giving rise to an inference of discrimination, in that her manager, Geoff Staff, expressed hostility to Plaintiff about her desire to observe Yom Kippur [and] Staff's supervisor, Michael Dadario, [also] made an offensive remark to Plaintiff."  (Pl. Mem. at 6.)  Plaintiff also argues that "Defendants' asserted defenses are pretexts for unlawful discrimination."  (Pl. Mem. at 7.)

"[R]eligious discrimination claims are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)."  Mandell v. County of Suffolk, 315 F.3d 368, 377 (2d Cir. 2003).  First, a plaintiff has the burden of establishing a prima facie case of discrimination by showing: "1) that [s]he belonged to a protected class; 2) that [s]he was qualified for the position [s]he held; 3) that [s]he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of

---

[1]     Plaintiff's claim "pursuant to § 8-107(a) of the Administrative Code of New York City" is "analyzed in light of analogous Title VII case law."  (Complaint ¶ 1); see Rivera v. Choice Courier Sys., Inc., No. 01 Civ. 2096, 2004 WL 1444852, at *6 (S.D.N.Y. June 25, 2004).

discriminatory intent."  Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004).  "Under

McDonnell Douglas, once plaintiff establishes a prima facie case, a presumption arises that his

employer unlawfully discriminated against him.  To rebut this presumption, the employer must

come forward with admissible evidence of legitimate nondiscriminatory reasons for its adverse

actions toward plaintiff."  Mandell, 315 F.3d at 380.  "Once the employer produces evidence of

legitimate reasons for its actions, the burden shifts back to the plaintiff to prove, by a

preponderance of the evidence, that the real reason for the adverse employment decision was

discrimination."  Id. at 380-81; see also Feingold, 366 F.3d at 152 ("If the defendant has stated a

neutral reason for the adverse action, to defeat summary judgment . . . the plaintiff's admissible

evidence must show circumstances that would be sufficient to permit a rational finder of fact to

infer that the defendant's employment decision was more likely than not based in whole or in

part on discrimination.") (internal quotation marks omitted).

     The Court will assume (arguendo) that Plaintiff has established a prima facie case of

discrimination because: (1) she is a member of a protected class because of her religion; (2) she

was qualified for her position; (3) she was terminated from her job; and (4) her termination may

have occurred under circumstances giving rise to an inference of discriminatory intent, although

factors (2) and (4) may be disputable.  See Shain v. Ctr. for Jewish History, Inc., No. 04 Civ.

1762, 2005 WL 2298165, at *5 (S.D.N.Y. Sept. 19, 2005) ("The burden of proof an employment

discrimination plaintiff must meet to survive a summary judgment motion at the prima facie

stage is de minimis.").

     In any case, Defendants have clearly articulated legitimate non-discriminatory reasons for

Plaintiff's termination, and Plaintiff has failed to demonstrate that these reasons are pretextual.

See Ralkin v. New York City Transit Auth., 62 F. Supp. 2d 989, 1001 (E.D.N.Y. 1999)

("[D]efendant has provided substantial evidence showing that plaintiff was terminated due to recurring deficiencies in her job performance.  Accordingly, the burden shifts to plaintiff to demonstrate by a preponderance of the evidence that defendant's presumptively valid explanation for her termination was merely a pretext for discrimination. . . . Plaintiff has not satisfied this burden.").  Defendants' stated reasons for Plaintiff's termination are that Ms. Murtha, Plaintiff's immediate supervisor, "continued to observe unacceptable behavior in Plaintiff's communications with her staff," as well as "tardiness and lack of preparation in conducting team meetings," and that Plaintiff "continued to fail to perform her job duties in an acceptable manner in her communication, organization and lack of follow-up."  (Def. Stmt. ¶¶ 21-24.)  Defendants further state that Plaintiff's mis-calculations cost the store "several thousands of dollars in overpayments to sales associates for incentive payments . . . for the weeks of October 27, 2004 and November 7, 2004."  (Def. Stmt. ¶ 22.)

Plaintiff's (lack of) evidence of pretext does not present a triable issue of fact of discrimination.  See Rivera v. Potter, No. 03 Civ. 1991, 2005 WL 236490, at *4-5 (S.D.N.Y. Jan. 31, 2005) ("Plaintiff has proffered no evidence from which a factfinder could reasonably conclude that Plaintiff's termination was a pretext for discrimination. . . . Plaintiff only offers his own subjective belief concerning the motivation behind his termination, but his belief, standing alone, is insufficient to survive a motion for summary judgment."); Henkin v. Forest Labs., Inc., No. 01 Civ. 4255, 2003 WL 749236, at *8 (S.D.N.Y. March 5, 2003) ("[T]he record makes clear that plaintiff was not reaching adequate levels of performance and was not following procedures correctly. On the basis of such a record, a rational factfinder would have no grounds for finding discrimination to have been even a contributing factor in the defendant's decision to discharge plaintiff."); see also See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137-38 (2d Cir. 2000)

("[W]here the termination occurs within a relatively short time after the hiring there is a strong inference that that discrimination was not a motivating factor in the employment decision.)

Indeed, Plaintiff has not provided any evidence to rebut the assertion that Ms. Murtha recommended Plaintiff's termination because of unacceptable job performance.  See Garvin v. Potter, 367 F. Supp. 2d 548, 565-66 (S.D.N.Y. 2005) ("Each of the disciplines was for a reason, such as failure to follow instructions, that was unrelated to the failure to work on Saturdays or Jewish holidays. . . . The plaintiff's suspicions of [religious] discrimination in the absence of any supporting evidence cannot defeat a motion for summary judgment.").  Plaintiff argues (unpersuasively) that she has shown pretext because she "received no complaints about her work performance prior to October 4, 2004, the day of the Chelsea store opening."  (Pl. Mem. at 7.) Yet the job for which Plaintiff was hired did not even begin until the opening of the Chelsea store on October 4, 2004.  (Def. Stmt. ¶ 3; Pl. Stmt. ¶ 7, 9.)  Plaintiff also argues unconvincingly that "[a] reasonable juror could find that Ms. Murtha was the person chosen by Mr. Staff and Mr. Dadario to do the dirty work of terminating Plaintiff," but Plaintiff has provided no support for this assertion.  See Garvin, 367 F. Supp. 2d at 566 ("All three suspensions were issued by Molia. The plaintiff has provided no evidence that would show that these suspensions were caused by religious discrimination; in fact, the plaintiff stated in his February 2002 deposition testimony that Molia had never made any comments about his religion.  The plaintiff stated that he felt that Molia took the disciplinary actions against him only because he was under orders from Raciti to do so, but he provides no facts to support this assertion."); Sasannejad v. Univ. of Rochester, 329 F. Supp. 2d 385, 393 (W.D.N.Y. 2004) ("Plaintiff's theory that the decision to terminate him must have been made for a discriminatory reason, is not enough to overcome the University's

showing.  Plaintiff relies primarily on his own speculation as to what was in Dr. Weliky's mind, and certain 'impressions' he made from observing him. . . . This is pure speculation.").

Plaintiff further argues that she can show pretext because Mr. Staff's conversation with her on September 22, 2004 was "unusually offensive and discriminatory" and Mr. Dadario, on the same day, "made an offensive and humiliating remark."  (Pl. Mem. at 7.)  However, "[e]ven with all rational inferences drawn in the plaintiff's favor, neither comment can be interpreted as evidencing bias against [Jews]."  See Lynch v. Pathmark Supermarkets, 987 F. Supp. 236, 243 (S.D.N.Y. 1997).  And even accepting as true the disputed statement by Mr. Staff on September 27, 2004, Plaintiff has not met her burden.  See Lichtenstein v. Triarc Cos., Inc., No. 02 Civ. 2626, 2004 WL 1087263, at *5 (S.D.N.Y. May 14, 2004) ("Stray remarks alone are not generally sufficient to support a Title VII claim but must be accompanied by some other indicia of discriminatory animus.").

 "Plaintiff has failed to meet [her] burden of proving Defendants' justification for dismissal is no more than a pretext.  Viewing all evidence in the light most favorable to Plaintiff, this Court is convinced that no rational jury could find that [Plaintiff's] termination was motivated by . . . religion."  See Ahmad v. Nassau Health Care Corp., 234 F. Supp. 2d 185, 196-97 (E.D.N.Y. 2002).

### B.    Hostile Work Environment

Defendants argue that "Plaintiff's hostile environment claim fails" because "there is nothing physically threatening or humiliating in Mr. Staff's discussions with Plaintiff, and they did not unreasonably interfere with [her] work performance."  (Reply at 8.)  Plaintiff argues that "humiliating and discriminatory incidents" with her supervisors establish "the existence of a working environment that a reasonable person would find hostile or abusive."  (Pl. Mem. at 20.)

"Proving the existence of a hostile work environment involves showing both objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive."  Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004) (internal quotation marks omitted).  "Courts look to the totality of the circumstances in determining whether a plaintiff has established a hostile work environment claim, considering factors including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. . . .  The test is whether the harassment is of such quality or quantity as to meet the standard of severe or pervasive harassment or abuse."  Dawson v. County of Westchester, 373 F.3d 265, 272-73 (2d Cir. 2004) (internal citations and quotation marks omitted).  "Where a hostile work environment claim is grounded in religious hostility, courts have been particularly cautious in adhering to the principle that the hostile or offensive conduct must involve some coercive or abusive behavior."  Ennis v. Sonitrol Management Corp., No. 02 CV 9070, 2006 WL 177173, at *9 (S.D.N.Y. Jan. 25, 2006).

In this case, "no reasonable juror could conclude that plaintiff's work environment was 'permeated with discriminatory intimidation, ridicule, and insult' that was so severe or pervasive as to alter the conditions of [her] employment."  See Goldschmidt v. New York State Affordable Housing Corp., 380 F. Supp. 2d 303, 312 (S.D.N.Y. 2005).  The comments of Mr. Staff and Mr. Dadario on September 22, 2004, perhaps reflecting lack of knowledge about the Jewish religion, were not (sufficiently) hostile or offensive to create a triable issue of fact.  See Garvin v. Potter, 367 F. Supp. 2d 548, 567-68 (S.D.N.Y. 2005) ("The crux of the plaintiff's hostile work environment claim is the plaintiff's allegation that his supervisors created a hostile

work environment by repeatedly commenting on the fact that he did not work on Saturdays. . . .
These incidents do not meet the standard for establishing a prima facie case of a hostile work
environment.").  While Plaintiff may have found the comments subjectively offensive, a
reasonable juror could not conclude that these comments were sufficiently severe or pervasive
to create an abusive working environment.  See Goldschmidt, 380 F. Supp. 2d at 312 ("[T]he
subjective element of the hostile work environment claim has been satisfied, that is, plaintiff
perceived his work environment to be hostile and abusive. . . . Plaintiff has, however, failed to
put forth sufficient evidence with respect to the objective element.").

### C.    Retaliation

Defendants argue that "Plaintiff's retaliation claim fails as a matter of law" because
"temporal proximity alone is insufficient to establish evidence of pretext . . . [and] Plaintiff has
failed to demonstrate the Defendants' legitimate, non-discriminatory reason for her termination
was pretextual."  (Reply at 9-10.)  Plaintiff argues generally and without substantiation that
"Defendants never intended to do anything but hurriedly punish Plaintiff, and retaliate against
her, for exercising her rights to complain of unlawful religious discrimination."  (Pl. Mem. at
15.)

"The McDonnell Douglas burden shifting analysis used in claims of discrimination . . .
also applies to retaliation claims[.]"  Terry v. Ashcroft, 336 F.3d 128, 141 (2d. Cir. 2003).  "First,
the plaintiff must establish a prima facie case.  That is, an employee must show '(1) participation
in a protected activity; (2) that the defendant[s] knew of the protected activity; (3) an adverse
employment action; and (4) a causal connection between the protected activity and the adverse
employment action.'"  Jute v. Hamilton Sundstrandt Corp., 420 F.3d 166, 173 (2d Cir. 2005)
(internal citations and quotation marks omitted).  "If a plaintiff sustains the initial burden, a

presumption of retaliation arises.  In turn, under the second step of the burden-shifting analysis,

the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse

employment action.  Finally, as for the third step, once an employer offers such proof, the

presumption of retaliation dissipates and the employee must show that retaliation was a

substantial reason for the adverse employment action."  Id. (internal citations omitted).

The Court assumes, arguendo, that Plaintiff has established a prima facie case of

retaliation because: (1) Plaintiff's discussion with Ms. Flegel was a protected activity; (2)

Defendants knew of Plaintiff's complaints; (3) Plaintiff suffered an adverse employment action

when she was terminated; and (4) the temporal proximity of her complaint and her termination

establishes "causal connection."  See Rivera v. Potter, No. 03 Civ. 1991, 2005 WL 236490, at

*4-5 (S.D.N.Y. Jan. 31, 2005) ("One of the primary means of establishing an inference of

retaliatory motive for an adverse employment decision is to show temporal proximity."); (see

supra at 9.)

However, Defendants have articulated legitimate non-retaliatory reasons for Plaintiff's

termination (see supra at 10), and Plaintiff has failed to show that retaliation played a part in her

termination.  See Ennis v. Sonitrol Mgmt. Corp., No. 02 CV 9070, 2006 WL 177173, at *18

(S.D.N.Y. Jan. 25, 2006) ("Plaintiff has not directed the court to any evidence that his discharge

was in retaliation for his complaint rather than the other non-retaliatory reasons offered by

defendants.  There is no evidence that the reasons defendants proffered for plaintiff's discharge

are untrue or are merely pretext for a retaliatory motive.  Nor is there evidence that plaintiff's

termination was actually motivated by retaliatory purposes.  Plaintiff has thus failed to meet his

burden on the third stage of the McDonnell Douglas test requiring him to show retaliatory

motive played a part in his termination or that his employer was motivated by retaliatory

animus.").  Plaintiff's argument that "[t]he temporal proximity of Plaintiff's complaint to Mr. Dadario, and the date of her termination, supports her allegation of retaliation, and is sufficient to permit it to proceed to a trial by a jury" is unpersuasive and does not provide a basis for denying summary judgment.  (Pl. Mem. at 15); see Richter v. Monroe County Dept. of Social Serv., No. 01 Civ. 6409, 2005 WL 351052, at *14 (W.D.N.Y. Feb. 11, 2005) ("Temporal proximity alone is insufficient to carry plaintiff's burden of proof beyond the prima facie stage, and nothing she has submitted shows that she will be able to persuade a fact-finder that the retaliation played a part in her termination."); see also Zacharowicz v. Nassau Health Care Corp., No. 02 Civ. 4510, 2005 WL 1530263, at *7 (E.D.N.Y. June 29, 2005) ("Defendants have articulated non-retaliatory reasons for Plaintiff's termination . . . Plaintiff fails to make a respectable attempt to contradict any of this evidence.  Instead he makes unsupported statements that 'it is reasonable to infer' that he was terminated on account of his religion and that it is 'reasonable to infer' that the negative evaluations in the record were 'just another aspect of Dr. Delfiner's insidious, retaliatory campaign.'  Because Plaintiff has offered no evidence that Defendant's stated reasons for his termination are a pretext for retaliation, this claim must be dismissed.").

## V.    Conclusion and Order

For the reasons set forth above, Defendants' motion for summary judgment [# 21] is granted.  The Clerk of the Court is respectfully requested to close this case.


Dated: New York, New York
       March 30, 2006


*RMB*

RICHARD M. BERMAN, U.S.D.J.